UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

V CARS, LLC, (formerly known as                    Hon.
VISIONARY VEHICLES, LLC),                          Case No.

    Plaintiff,

vs.

KCA ENGINEERING, LLC,

    Defendant.
_____/

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski (P55117)
Attorneys for Plaintiff
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300
akochanowski@sommerspc.com

KOPELWITZ OSTROW FERGUSON
WEISELBERG KEECHL
Fred A. Schwartz
Attorneys for Plaintiff
700 S. Federal Highway, Ste. 200
Boca Raton, FL 33432
(561) 910-3070
schwartz@kolawyers.com

_____/

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

    NOW COMES Plaintiff, V CARS, LLC (formerly VISIONARY VEHICLES, LLC), by and through its attorneys, SOMMERS SCHWARTZ, P.C. and KOPELWITZ OSTROW FERGUSON WEISELBERG KEECHL, for its Complaint against Defendant, KCA Engineering, LLC says as follows:

**INTRODUCTION**

**JURISDICTIONAL ALLEGATIONS**

1. V Cars, LLC, formerly Visionary Vehicles, LLC ("VV") is a Delaware limited liability company, with its current principal place of business in Boca Raton, Florida.

2. KCA Engineering, LLC ("KCA") is a domestic limited liability corporation organized under the laws of Michigan, ID Number E177ON. At all relevant times, KCA has conducted business in the United States, Washtenaw County.

3. Pursuant to 28 U.S.C. § 1332, the Court has original jurisdiction over the diversity of this case because the Plaintiff is a citizen of a State and the Defendant is a citizen of another State. In addition, the amount in controversy is in excess of Seventy Five Thousand and no/100 ($75,000.00) Dollars.

4. Venue is proper in this judicial circuit pursuant to 28 U.S.C. § 1991. Defendant resides within this jurisdictional district and many of the acts complained of occurred within this judicial district.

A. **BACKGROUND**

5. VV is a company originally formed in 2004 to design, engineer, arrange for the manufacturing and homologation, importation, distribution and marketing of Chinese-manufactured automobiles into the North American market.

6. Malcolm Bricklin ("Bricklin") was the driving force in forming VV. Bricklin had been a successful importer of cars dating back to the late 1960's. His first venture resulted in the initial importation and subsequent ubiquity of Subaru automobiles in the United States. In the 1980's, Bricklin

successfully turned a rebranded Fiat made by an obscure Communist-owned car company in then-Yugoslavia into a household name through the importing and marketing of Yugo automobiles into the United States. Bricklin also successfully imported into the United States the Fiat Xl/9 and 2000 Spyder, from Bertone and Piniforina, after Fiat halted their manufacture in the early 1990's.

7. Chery Automobile Company, Ltd. ("Chery"), is a Chinese car manufacturer. VV entered into a joint venture with Chery in December, 2004 to create a joint venture company in China, manufacture re-branded and homologated Chery-sourced cars, and export them to North America.

8. In early 2004, Bricklin developed a plan for VV to partner with a Chinese automobile manufacturer. He believed that it would be commercially viable to import Chinese vehicles to North America and market the vehicles to consumers, not as entry-level basic transportation, but as luxury vehicles which cost substantially less than the existing European and Asian luxury models such as BMW, Audi and Lexus.

9. Bricklin met with Chery in early 2004. Becoming convinced that Chery had the capacity to produce sufficient volume of passenger automobiles to populate an export business to North America, Bricklin saw a substantial potential opportunity in a Chery/VV venture to design, homologate for the U.S., and import Chery vehicles for sale in North America. VV's plan, subsequently agreed to by Chery, was to oversee the distribution of these Chinese manufactured vehicles and to create a network of dealers in the US to sell and service them to consumers.

10. In December, 2004, Chery and VV agreed to jointly undertake a business for profit, to each contribute certain defined assets to form a Chinese-based joint venture company, to manufacture Chery vehicles in China, and grant to VV the exclusive import and distribution rights to the United States, Mexico, Canada, Puerto Rico and the Caribbean of vehicles and spare parts that the joint venture would manufacture.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

11. Upon each side's assignment of assets, Chery was to own sixty (60%) percent and VV forty (40%) percent of the joint venture company.

12. Five (5) Chery vehicle platforms were exclusively designated to the joint venture, the S12, B14, B21, B22, and B23, vehicles then under development by Chery.

13. Chery and VV's relationship eventually soured, when Chery formed a joint venture with an investor into VV, Israel Corporation, in early 2007. The wrongdoing associated with that action is the source of an arbitration in Hong Kong between VV and Chery, currently pending, and a case currently pending in the Southern District of New York by VV against Israel Corporation ("IC").

14. Unknown to VV until recently, as Chery formed a joint venture with IC, it also went into business with KCA. There are at least two multi-party contracts between KCA and Chery and/or third-parties and Chery for so-called engineering services being provided by KCA to Chery and/or the new joint venture with Israel Corporation.

15. The contracts at issue were procured through wide-spread theft of VV's confidential and proprietary information, and were driven by KCA's sole shareholder, Dennis Gore ("Gore"). Gore was a former high-level employee of VV, which had worked on a joint venture with Chery for nearly two years.

16. Gore was hired by VV in January, 2005 to undertake, among other things, product development of the platforms for the Chery/VV joint venture. He was its chief technical officer.

17. Gore received confidential and proprietary information about VV's plans to enter into the joint venture with Chery and the details of how the joint venture would import and distribute vehicles in the U.S. Gore received details about the Chery platforms from VV, and was given access to the technical information provided by Chery about its platform plans and their adaptation to the US market. Gore was given access to this information in his capacity as an employee and officer of VV.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

18. In December, 2006, Chery and IC established an escrow separate and apart from VV, and in February, 2007 set up a Delaware company, Quantum (2007) LLC, as a corporate vehicle for their new joint venture. Its purpose is manufacturing and exporting Chery vehicles.

19. In November, 2006, while still employed by VV, Gore secretly established a Michigan corporation named Pharos Engineering ("Pharos"), and pitched Chery the notion that Chery would employ Pharos to conduct engineering support for the B21 and other platforms that were to be part of the Chery/VV joint venture.

20. Pharos was abandoned, and Gore then formed Defendant KCA on December 18, 2006. VV knew nothing about KCA until after Gore left VV's employ, and then was misled by Gore as to its activities, as further set forth below.

21. While employed at VV, Gore signed an agreement prohibiting him from competing against VV for a period of two years after the end of his employment, and from using confidential information obtained through his employment by VV for a like period. (Exhibit 1).

22. Gore began spying on VV for the Chinese company Chery on or around November, 2005, and continued secretly passing the Chinese information about VV, its founder, its finances, and strategic information to enable the Chinese to take advantage of VV through the end of his employment in November, 2006.

23. KCA received a multi-year contract through a third party to provide engineering services to Chery and/or the new Chery/IC joint venture in December, 2006. KCA billed out the services of Dennis Gore and former VV employees John Kobylarz, Peter Oppelt, and Lydell Powell. The contract was passed through a third party, to avoid detection by VV. The so-called engineering services ostensibly had to do with the same work that Gore and the former VV employees had performed for VV.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

24. Sometime in 2008 or 2009, KCA signed a second, five-year contract to provide so-called engineering services to Chery and/or the new Chery/IC joint venture. That contract continues today.

25. Upon information and belief, KCA has billed millions of dollars in so-called engineering services to Chery and/or the new Chery/IC joint venture.

26. In reality, both contracts are a sham. VV had sued Chery for breach of its joint venture agreement, and for other wrongdoings including violations of the RICO statute in this Court. The suit was severed and dismissed in favor of arbitration in Hong Kong, which is ongoing. One of the allegations in that arbitration is that Chery stole confidential and proprietary business information through its secret information conduit with Gore. The contract with KCA, which had, and upon information and belief, has no other "clients" but Chery and/or the new Chery/IC joint venture, is a payoff to Gore for the spying services he provided while employed by VV and an inducement to keep him from testifying for VV and against Chery in the arbitration.

27. In the alternative, KCA has provided some legitimate services to Chery and/or the new Chery/IC joint venture. Those services could only have been provided by Gore's breach of his agreement with VV, and KCA is therefore the beneficiary of illicit and illegally-obtained information that has enabled it to contract with the Chinese.

28. KCA used and continues to use VV's confidential and proprietary information to assist the Chinese to establish their venture of exporting Chery vehicles.

29. KCA has attempted to hide the existence of the contracts, the nature of its services, its payments from the Chinese, and the nature of the new joint venture secret from VV.

30. VV was previously engaged in other litigation with Chery, both being named defendants in a breach of contract suit brought by a third-party. During the course of that case, Dennis Gore was deposed in June and December, 2007. During the course of these depositions, Gore, who was then and is

now, the managing director, agent, and sole shareholder of KCA, was asked about the services, if any, that KCA provided to the new Chery/IC joint venture. He lied under oath when he answered it was not providing any such services.

31. VV only learned about the nature of KCA's contracts with Chery and/or the new Chery/IC joint venture in 2010. To the extent Defendant claims that a statute of limitation bars or limits any cause of action set forth herein, the existence of facts necessary to learn of the injury and/or cause of action was purposefully concealed by KCA and could not have been determined by VV prior to 2010.

32. As a direct and proximate result of KCA's conduct, VV was injured in its business and property and continues to suffer injuries and will continue to suffer injuries. Specifically, VV incurred the following general categories of monetary damages:

    a. Loss in excess of Twenty Six Million and no/100 ($26,000,000.00) Dollars in funds invested in VV by innocent investors, and in loans to VV by innocent investors, spent for the benefit of the joint venture in reliance on and in furtherance of the agreement to start the joint venture company, the interest paid on loans obtained to make said investment, accounting expenses, and legal expenses, and other out-of pocket expenses and increased administrative and other costs, all directly resulting from the acts set forth above;

    b. The opportunity to make future profits out of VV's share of the joint venture and successful import business.

33. KCA has obtained under false pretenses, as a result of material misrepresentations and omissions substantial benefits that must be disgorged under law and equity. These include:

    a. The value of the North American plans, know-how, contacts, investments, trade secrets, proprietary information and confidential information improperly and illegally obtained from VV;

    b. The value of the payments made to KCA by Chery and/or the new Chery/IC joint venture and the future worth of KCA's current five-year contract for services.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## COUNT I

## FRAUD AND/OR
## FRAUDULENT CONCEALMENT

34.  The allegations of Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

35.  The actions complained of are fraudulent in nature. KCA illegally and illicitly obtained valuable non-public information from VV through its managing agent Gore. KCA then concealed the fact that it had and was using the information for its own benefit for several years. KCA allowed its principal Gore to make material misrepresentations at his deposition to conceal the nature and fact of its wrongdoing. KCA has worked in concert with Chery and others to hide the fact that it has been receiving payoffs for past spying services.

36.  The material omissions, concealments, and representations included, but were not limited to, the following statements made at various times between June, 2007 and December, 2007, with the intent that they would be believed and relied upon by VV:

   a.  That KCA was not doing business with Chery;

   b.  That KCA was not using proprietary and confidential information concerning the products, dealers, and markets prepared by VV.

37.  These material representations and/or omissions and/or concealments were false.

38.  Acting in reliance upon KCA's material omissions, VV took action or forbore from taking action, which included, but were not limited to, the following: continuing to expend portions of approximately Twenty Six Million and no/l00 ($26,000,000.00) Dollars to establish the ground work and organization required to fulfill its obligations in connection with the Chery/VV joint venture company; defended a litigation (*Grant v. VV*) under false information knowingly provided by KCA; did not take immediate action to protect its interests in connection with the new joint venture creation

between Chery and IC, which, had it known of KCA's role, it could and would have taken, and other actions.

39. KCA benefited directly from VV activities between 2004 and 2006 (which were undertaken at the cost of millions of dollars for its own benefit) by obtaining VV's confidential and proprietary information, which included, but was not limited to, the following: detailed information about the U.S. auto market; establishment of a dealer network; design and production of vehicles appealing to U.S. consumers; processes and procedures to import vehicles to the U.S.; processes and procedures for meeting U.S. safety and emission regulations and standards; marketing and public relations strategies; network of industry contacts, vendors and suppliers; and favorable publicity and advertising for Chery in the U.S. and international auto world.

40. As a direct and proximate result of KCA's illegal conduct, VV has suffered substantial economic injury, including loss of its valuable property and the economic value associated with it, the loss of its confidential and proprietary information and trade secrets, past and future lost profits, damage to its business reputation and goodwill, loss of its investment, and loss of the company's economic value.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS

41. The allegations of Paragraphs 1 through 40 are incorporated by reference as if set forth herein.

42. VV invested millions of dollars to develop an extensive amount of confidential and/or proprietary information and trade secrets relating to the effort to commercialize Chery vehicles in the U.S. This included, but was not limited to, the following: detailed information about the U.S. auto market; establishment of a dealer network; design and production of vehicles appealing to U.S.

consumers; processes and procedures to import vehicles to the U.S.; processes and procedures for meeting U.S. safety and emission regulations and standards; marketing and public relations strategies; and network of industry contacts, vendors and suppliers.

43. In addition to the above, VV prepared a North American Product Plan, which was confidential, proprietary and a trade secret of VV.

44. VV took commercially reasonable efforts to maintain the confidentiality of its confidential and proprietary information and trade secrets, including adopting employee manual restrictions and entering into non-disclosure agreements with persons privy to its information.

45. KCA misappropriated VV's confidential and proprietary information and trade secrets in violation of Michigan law by using them in the new Chery/IC joint venture, and has used and continues to use said information today

46. As a direct and proximate result of KCA's illegal conduct, VV has suffered substantial economic injury, including loss of its valuable property and the economic value associated with it, the loss of its confidential and proprietary information and trade secrets, past and future lost profits, damage to its business reputation and goodwill, loss of its investment, and loss of the company's economic value.

## COUNT III

## CONVERSION

47. The allegations of Paragraphs 1 through 46 are incorporated by reference as if set forth herein.

48. KCA's wrongful dominion and control over its confidential and proprietary information constitutes conversion.

49. As a direct and proximate result of KCA's conversion, VV has suffered substantial economic injury, including loss of its valuable property and the economic value associated with it, the loss of its confidential and proprietary information and trade secrets, past and future lost profits, damage to its business reputation and goodwill, loss of its investment, loss of the company's economic value and treble damages.

## COUNT IV

## CIVIL CONSPIRACY

50. The allegations of Paragraphs 1 through 49 are incorporated by reference as if set forth herein.

51. Beginning in December, 2006, and continuing to today, KCA and Chery communicated and conspired with each other to obtain VV's confidential and proprietary information and to otherwise destroy VV's ability to create the Chery/VV joint venture company, import Chery vehicles to the U.S. and distribute and market those vehicles to consumers. Said actions were a combination of two (2) or more persons, by some concerted action, to accomplish a criminal or unlawful purpose or to accomplish a lawful purpose by criminal or unlawful means.

52. As a direct and proximate result of the conspiracy, VV suffered damages including, but not limited to: loss of part or all of $26 million invested in VV by innocent investors, and in loans to VV by innocent investors, spent for the benefit of the VV/Chery joint venture, the interest paid on loans obtained to make said investment, accounting expenses, and legal expenses, and other out-of-pocket expenses and increased administrative and other costs, all directly resulting from the acts set forth above; loss of the opportunity to make future profits out of VV's share of the joint venture; and loss of

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

profits it expected to make as an importer and distributor of the Chery vehicles and spare parts under its exclusive rights agreement with Chery

## COUNT V

## UNJUST ENRICHMENT

53. The allegations of Paragraphs 1 through 52 are incorporated by reference as if set forth herein.

54. Continuing through November, 2006, VV generated valuable, confidential, technical, and proprietary information which included, but was not limited to, the following: detailed information about the U.S. auto market; establishment of a dealer network; design and production of vehicles appealing to U.S. consumers; processes and procedures to import vehicles to the U.S.; processes and procedures for meeting U.S. safety and emissions regulations and standards; marketing and public relations strategies; network of industry contacts, vendors and suppliers; and favorable publicity for Chery in the U.S. and international auto world.

55. This information was shared with KCA's principal in circumstances which imposed a duty on the Defendant not to use the information without compensation to VV, and has otherwise conferred a benefit in favor of KCA.

56. There is no contract between VV and KCA.

57. It would be inequitable for KCA to keep the benefits under the circumstances.

58. As a direct and proximate result of KCA's appropriation of the benefits conferred upon it, the Defendant has obtained substantial economic benefits that must be disgorged.

## COUNT VI

## ACCOUNTING/CONSTRUCTIVE TRUST

59. The allegations of Paragraphs 1 through 58 are incorporated by reference as if set forth herein.

60. KCA at all pertinent times acted in concert with Chery and/or the new joint venture in wrongfully obtaining VV's trade secrets and confidential and proprietary information.

61. KCA has retained VV's trade secrets and confidential and proprietary information and has precluded VV from possessing, controlling or participating in the use or benefit of those assets.

62. KCA has retained assets composed of millions of dollars of illegally-obtained sham contracts obtained only because KCA's principal spied on VV and willfully breached his non-competition and confidentiality agreement with VV.

63. A true and equitable settlement of the assets and accounts belonging to VV is required, and the use of this Court's equitable powers is needed in order to compel KCA to account to VV for all assets that have come into its possession or into the possession of Chery or any other person through KCA's wrongful acts, together with all of the avails of said assets, interest earned or accumulated thereon, and any profits which they have realized by dealing in VV's assets from December, 2006 to the date of such accounting.

64. As part of the accounting that is required, it is or it may become necessary to provide for the tracing of assets to determine if any assets have been dissipated, or removed or lost, and to provide for the imposition of a constructive trust on VV's assets, or an equitable lien to the end that a full, accurate and complete accounting of all of the assets, income and liabilities and net worth of KCA is determined and rendered by the Court.

65. Legal remedies are not alone adequate and VV requires the equitable remedy of accounting, injunctive relief, an equitable lien, and a constructive trust in order to obtain full and complete relief.

## COUNT VII

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

66. The allegations of Paragraphs 1 through 65 are incorporated by reference as if set forth herein.

67. Gore and VV entered into an agreement by which Gore agreed not to compete with VV for a period of two years following the end of his employment and which prohibited Gore from using VV's confidential information for the same period of time (the "NDA") (Exhibit 1).

68. Gore breached that agreement by using and diverting VV's confidential information to the advantage of KCA in assisting Chery establish the new Chery/IC joint venture.

69. KCA, through its sole shareholder Gore, knew of the existence of the NDA.

70. KCA intentionally and willfully instigated Gore's breach of the NDA by using VV's confidential information to its own benefit to obtain contracts with Chery and/or the new Chery/IC joint venture.

71. As a consequence of KCA's tortuous interference with the NDA, VV has been damaged in the following ways: loss of part or all of $26 million invested in VV by innocent investors, and in loans to VV by innocent investors, spent for the benefit of the VV/Chery joint venture, the interest paid on loans obtained to make said investment, accounting expenses, and legal expenses, and other out-of-pocket expenses and increased administrative and other costs, all directly resulting from the acts set forth above; loss of the opportunity to make future profits out of VV's share of the joint venture; and loss

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

of profits it expected to make as an importer and distributor of the Chery vehicles and spare parts under its exclusive rights agreement with Chery.

**WHEREFORE,** VV requests that this Court grant it relief as against Defendant:

A.    A money judgment as determined by the Court or jury pursuant to common law against KCA, and said amount trebled as provided by law as provided for under the conversion statute of Michigan.

B.    Compensation for its actual costs and attorney fees incurred in connection with prosecuting this case.

C.    Injunctive relief enforcing KCA from using its confidential and proprietary information and trade secrets.

D.    Injunctive relief against Defendant restraining it by the order and injunction of this Court from using VV's assets.

E.    An accounting under the direction of this Court, of each and every transaction conducted by said Defendant with respect to VV, including all of KCA's income, disbursements, assets, liabilities, net worth, and capital accounts, and that such accounting be fully adjusted in order to ascertain the respective rights of the Plaintiff and of Defendant with respect to those assets, liabilities, accounts and net worth from December, 2006 to the present.

F.    Exemplary damages.

G.    Such other relief as may be just and necessary, so as to make VV whole.

**PLAINTIFF DEMANDS TRIAL BY JURY**


LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

s/ Andrew Kochanowski (P55117)
Attorneys for Plaintiff
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300
akochanowski@sommerspc.com

-and-

KOPELWITZ OSTROW FERGUSON
WEISELBERG KEECHL
Fred A. Schwartz
Attorneys for Plaintiff
700 S. Federal Highway, Ste. 200
Boca Raton, FL 33432
(561) 910-3070
schwartz@kolawyers.com

Dated:  June 29, 2011